# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 5, 2024 Session

## STATE OF TENNESSEE v. KEEDRIN COPPAGE

**Appeal from the Criminal Court for Shelby County**
**Nos. 20-02446, C2004012   James M. Lammey, Judge**

_____

### No. W2023-00205-CCA-R3-CD

_____

Defendant, Keedrin Coppage, was convicted by a Shelby County jury of first degree premeditated murder and tampering with evidence.  The trial court imposed a life sentence for count one, and a consecutive sentence of six years for count two.  Defendant raises twelve issues on appeal: (1) sufficiency of the evidence to support his first degree premeditated murder conviction; (2) admission of the Defendant's prior bad acts against the victim under Tennessee Rule of Evidence 404(b); (3) admission of the victim's statements under Tennessee Rule of Evidence 804(b)(6); (4) denial of his motion for a continuance of the trial date; (5)  denial of his motion to admit recordings and photographs; (6) exclusion of portions of body camera footage; (7) denial of Defendant's motion for mistrial; (8) exclusion of the victim's family's civil law suit; (9) allowing the jury to use transcripts of audio recordings; (10) not allowing defense counsel to question an officer regarding explicit recordings sent to him by Defendant; (11) not allowing defense counsel to question whether Defendant was charged for the prior bad acts admitted under Tennessee Rule of Evidence 404(b); and (12) that he is entitled to relief under the cumulative error doctrine.  After a thorough review of the entire record, the briefs, oral arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Phyllis Aluko (of counsel), District Public Defender, and Barry W. Kuhn (on appeal), and Samuel Christian and William Howell (at trial), for the appellant, Keedrin Coppage.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Maryanne Bell and Venecia Patterson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On August 13, 2020, Defendant was indicted for first degree premeditated murder following the death of his ex-girlfriend, Sabrina Nguyen, from multiple stab wounds. He was also indicted for tampering with evidence for hiding the victim's vehicle.

*Pretrial Motions*

Prior to trial, the State filed a motion to admit multiple prior instances of abuse and criminal conduct by Defendant against the victim under Tennessee Rule of Evidence 404(b) ("Rule 404(b)") and the victim's statements regarding the incidents under Tennessee Rule of Evidence 804(b)(6) ("Rule 804(b)(6)"). The trial court held a hearing over four days, October 4 and 5, November 5, and December 6, 2021. At the hearing, the State presented evidence that established the following timeline:[1]

| Date | Incident |
|---|---|
| **February 15, 2019** | The victim created two audio recordings, in which Defendant made multiple threats and audibly assaulted the victim. |
| **June 15, 2019** | Defendant attacked the victim as she walked into her house. |
| **June 17, 2019** | The victim was granted her first order of protection against Defendant. |
| **August 10, 2019** | Defendant crashed the victim's car into the victim's brother's car, totaling both vehicles. Defendant dragged the victim across the road by her hair and then fled the scene. |
| **August 12, 2019** | Defendant attempted to break into the victim's house twice. The victim was granted her second order of protection based on this incident on August 13, 2019. |
| **September 11, 2019** | Defendant sent threatening text messages and went to the victim's workplace while she was not there. |
| **September 12, 2019** | Defendant was in the victim's driveway after having sent her threatening text messages the previous night. Later that night, the victim reported that Defendant ran her off the road. |
| **December 5, 2019** | Defendant left an "orange warning paper" on the victim's vehicle and called to threaten her. Later that night, Defendant called the victim and threatened to kill her. |

---

[1] Each incident is briefly summarized here and more fully detailed in the summary of trial testimony. Throughout this opinion, each incident will be referenced by the date of the Rule 404(b) incident.

| | |
|---|---|
| **December 6, 2019** | Defendant called the victim and stated that he was next door with a rifle. The victim was granted a third order of protection the same day. |
| **December 10, 2019** | Defendant kidnapped the victim from her workplace. |
| **December 14, 2019** | Defendant repeatedly called and threatened to harm the victim. |
| **December 15, 2019** | Defendant repeatedly called the victim and played "creepy music." |
| **December 17, 2019** | Defendant was arrested for aggravated stalking and violation of bond conditions, and served with the third order of protection. |
| **December 19, 2019** | Defendant kidnapped the victim from the courthouse at knifepoint. The third order of protection was dismissed. |
| **December 20-23, 2019** | Defendant kidnapped the victim and went to Nashville. |
| **December 27, 2019** | The victim reported that Defendant had stolen her car and told her that he drove her car into the river. |
| **December 30, 2019** | The last day the victim was seen alive by her brother. |
| **January 2, 2020** | The victim's body was found. |

Following the hearing, the trial court ruled that each of the incidents had been proven by clear and convincing evidence and was relevant to a material issue other than propensity, namely Defendant's motive, intent, and settled purpose to harm the victim. Further, the trial court found that the probative value of each incident outweighed the danger of unfair prejudice, concluding that each incident was admissible under Rule 404(b). The trial court also ruled that the victim's statements to others regarding the incidents were admissible under Rule 804(b)(6) because Defendant procured the victim's unavailability, at least in part, to prevent her testifying as a witness against him.

On July 7, 2022, Defendant made an oral motion for a continuance of the trial date after he received two DNA reports approximately one month prior to trial. Defense counsel explained he would need additional time to review the reports and to request material from the Tennessee Bureau of Investigation ("TBI"). He further argued that his expert was unavailable for the scheduled trial date. The DNA reports were not included in the record on appeal. At the hearing on the motion to continue, the State explained that one of the reports involved testing of DNA obtained during a postmortem sexual assault kit. The report showed that Defendant's DNA was present on the vaginal and rectal swabs taken from the victim. There was an "additional allele obtained at one locus" on the vaginal swabs, and Defendant was the major contributor to "a mixture of two individuals including at least one male" found on the rectal swabs. Both the additional allele and the minor contributor to the mixture of two individuals were "inconclusive for comparison purposes"

because of the limited information obtained. The DNA reports also showed that Defendant's DNA was not found under the victim's fingernails, and there was no DNA present on the weapons connected to the victim's murder. A mixture of the victim's and Defendant's DNA was found on the shirt and pants Defendant wore at the time of the victim's murder; no other contributor was identified. The State argued that Defendant would not be prejudiced by this report because no DNA was found on the weapons or under the victim's fingernails.

The second DNA report, from a sexual assault kit collected after the December 10 Rule 404(b) incident, showed an inconclusive minor contributor. The State explained that it did not plan to use the second DNA report at trial and noted that Defendant had not been charged with rape from that incident. The trial court denied the motion to continue.

Prior to trial, Defendant filed a motion to admit certain audio recordings and photographs. At the July 15, 2022 hearing on the motion, Defendant sought to introduce audio recordings and photographs created on December 20, 2019, depicting a sexual encounter between Defendant and the victim shortly after the victim reported the December 19 incident, and video recordings from December 27, 2019, depicting a sexual encounter between Defendant and the victim via Facetime.[2] The State argued that Defendant's recordings were not relevant, that the recordings were hearsay without an exception, that the statements in the recordings were self-serving, and that the unfair prejudice "against the victim" outweighed any probative value because Defendant had not been charged with rape. Defendant argued that the statements in the recording were "potentially not for the truth of the matter," but instead relevant "to show the context of this relationship above and beyond what the 404(b) incidents would show." Defendant further argued that the statements were excited utterances because both the victim and Defendant were in a "state of passion" and "reacting in the moment." Defendant also noted that the recordings contained the victim's threat to harm Defendant if he cheated on her and that threat was allowable extrinsic evidence of the victim's bias. Finally, Defendant asserted that under *Brown*[3] his due process right to present a defense could act as an exception to the hearsay exclusionary rule. The trial court found that the recordings were not relevant because there had been no allegation that the victim and Defendant were not having consensual sex

---

[2] Defendant's motion to admit the recordings is not in the record and the recordings and photographs were not exhibited to the pretrial hearing. The transcript of the hearing on the motion is included in the record on appeal. However, the recordings are in the record as they were admitted for identification purposes during Defendant's offer of proof at trial. These recordings will be referred to collectively as "Defendant's recordings."

[3] *State v. Brown*, 29 S.W.3d 427, 436 (Tenn. 2000) (holding that the hearsay exclusionary rule yields when it "operates to deprive a defendant of his or her right to present relevant and reliable evidence that is critical to establish a defense").

- 4 -

during the time period of the recordings, and that the statements in the recordings were not admissible under the excited utterance exception. The trial court noted that Defendant could testify that he and the victim had consensual sex and that the recordings existed, but the recordings themselves were inadmissible self-serving hearsay.

At the same hearing, the trial court addressed a motion filed by the State to exclude reference to the victim's family's lawsuit against the City of Memphis and Memphis Police Department ("MPD") for failing to arrest Defendant for the December 19 Rule 404(b) incident. The State argued that the lawsuit was not relevant and the danger of unfair prejudice outweighed any probative value. Defendant argued that the lawsuit was relevant impeachment evidence to show potential bias of both the victim's family and MPD officers. The trial court determined that the lawsuit was not relevant and disallowed "any cross-examination or any inquiry into whether there is a lawsuit[.]"

*Trial*

At trial, Jimmy Nguyen, the victim's brother, identified Defendant as the victim's ex-boyfriend. Mr. Nguyen described the victim as outgoing and joyful before she began dating Defendant, but she "lost herself" toward the end of her life. On June 15, 2019, Mr. Nguyen visited the victim in the hospital, and she told him that Defendant, while wearing a red mask, had jumped out of a bush and attacked her. Mr. Nguyen observed that the victim had a black eye and a cut on her side.

On August 10, 2019, Mr. Nguyen was with Quiesha Morton when the victim called and asked him for gas money. Mr. Nguyen could tell something was wrong because of the victim's tone of voice, so he sent her the money. Shortly after the phone call, he received an S.O.S. message from the victim with her location. When he arrived at that location, he saw Defendant drive away in the victim's car with the victim in the passenger seat. Mr. Nguyen followed the victim's vehicle to the interstate, and Ms. Morton was on the phone with both 911 and the victim. While on the phone call, Mr. Nguyen could hear Defendant "beating her with something" and screaming that he was going to kill her. Mr. Nguyen passed Defendant to get closer to what he believed was a police officer's vehicle, and when he did so Defendant rear-ended Mr. Nguyen's vehicle. The victim got out of the car to check on Mr. Nguyen, but Defendant followed and dragged the victim across the interstate by her hair causing abrasions across her lower back. Defendant put Mr. Nguyen in a choke hold but he released Mr. Nguyen when the victim hit him. Defendant fled the scene, and police were not able to locate him. Both the victim's and Mr. Nguyen's cars were totaled in the accident.

Two days later, on August 12, 2019, Mr. Nguyen and the victim were watching television together at home when they heard a noise come from the victim's bedroom. Mr.

Nguyen went to check and noticed that a window was cracked open, a candle had fallen off the window sill, and the bars on the outside of the window were "pushed in like somebody was trying to come in." Mr. Nguyen stated that later that night, Defendant tried to enter through another window. Mr. Nguyen saw Defendant walk across the street shortly after the second attempt to enter the house. About a week later, on August 20, 2019, Mr. Nguyen saw Defendant walk into a neighbor's backyard around two or three in the morning wearing a red mask on top of his head.

In September 2019, the victim called Mr. Nguyen to tell him that Defendant had run her off the road and caused her to strike a pole, totaling her vehicle. The victim told him that Defendant again wore the red mask.

In the beginning of December 2019, the victim called Mr. Nguyen and told him she was in Nashville, where Mr. Nguyen lived, and wanted to visit him. Mr. Nguyen refused to give her his address because he was "afraid" that she was with Defendant. On either December 22 or 23, 2019, the victim called Mr. Nguyen because she needed a ride home from the Memphis police station, but he was not in Memphis at the time. When Mr. Nguyen returned to Memphis for Christmas, the victim told him that Defendant had kidnapped her and taken her to Nashville, and when he brought her back to Memphis, he told her to get out of her car and lay in the grass because he was going to kill her. Defendant then dropped her off at the police station and drove away in her car. Mr. Nguyen noticed that the victim's hair, which was usually long, had been cut and "looked like somebody grabbed it all at once and cut it off with some scissors." The victim told him that Defendant had cut it because she refused to have sex with him. Mr. Nguyen testified that on December 26, 2019, Defendant texted the victim, with a laughing emoji, and told her to "pick [her] car up out river." Mr. Nguyen last saw the victim on December 30, 2019, as she walked to Walgreens.

On cross-examination, Defendant played a recorded conversation between Mr. Nguyen and Defendant in which Mr. Nguyen told Defendant that the victim had admitted that she made up the June 15 incident that Defendant had attacked her at her home. Mr. Nguyen admitted that the only incidents he personally witnessed were the August 10 incident where he was involved in the crash, and the August 12 incident when Defendant attempted to break into the house. Regarding the September 12 incident, Mr. Nguyen clarified that the victim and their father had told him that it was a truck that had run the victim off the road. Mr. Nguyen confirmed that when the victim was in Nashville, she FaceTimed him, and he did not see Defendant with her. Mr. Nguyen agreed that when he last saw the victim walking to Walgreens, he believed she was going to Defendant's house to get her car back.

- 6 -

Queisha Morton, the victim's friend, recalled that the victim and Defendant "were always into it with each other." On June 15, 2019, while the victim was in the hospital, the victim told her over FaceTime that Defendant had attacked her, and the victim showed Ms. Morton the injuries. On August 10, 2019, Ms. Morton was with Mr. Nguyen when the victim sent an S.O.S. message to Mr. Nguyen. While Mr. Nguyen pursued Defendant driving the victim's vehicle, Ms. Morton was on the phone with the victim and the police. She heard the victim crying and heard sounds like Defendant punching and hitting the victim with a belt. The victim later told Ms. Morton that Defendant had raped her earlier that day, and described her injuries. Ms. Morton recalled that the victim had bruises on her thigh, buttocks, back, arms, and legs.

A few days after the car accident, Ms. Morton was at the victim's house when Defendant attempted to break in through a window. Ms. Morton was aware of another incident when Defendant ran the victim's vehicle off the road, causing her to strike a pole. In December 2019, the victim told Ms. Morton that Defendant had kidnapped her at knifepoint from her workplace and again from the courthouse. Ms. Morton was aware that the victim had filed for an order of protection against Defendant. The victim complained to Ms. Morton about "stalker-ish calls" from Defendant. She explained that Defendant would call repeatedly in quick succession from different numbers or on social media. On cross-examination, Ms. Morton explained that she had given the victim her extra cell phone after the August 10 incident on the interstate. Ms. Morton knew the victim was still in contact with Defendant because she could track the location of the cell phone she gave to the victim. She stated that Defendant likely obtained the number for that cell phone from the victim. Ms. Morton agreed that the victim often complained about Defendant cheating on her. On redirect examination, Ms. Morton explained that she had been frustrated that the victim continued her relationship with Defendant after all of the incidents between them.

Angel Langford, the victim's neighbor and best friend, testified that she went to the hospital to see the victim after the June 15 incident. On June 17, 2019, the victim texted her a screenshot of Defendant's social media post threatening to expose explicit videos and photographs of the victim. Ms. Langford identified text messages sent in a group text message including her, the victim, and Ms. Langford's sister. She explained that she and her sister were frustrated with the victim because of her continued relationship with Defendant. In the group text message, the victim had sent audio recordings taken at Defendant's house in February 2019. Ms. Langford had listened to the recordings and recognized Defendant's and the victim's voices. In anticipation of admitting the recordings and playing them for the jury, the State had the recordings transcribed to assist the jury in listening to them. Defendant objected to the jury's use of the transcripts, but the trial court overruled the objection, stating that Defendant had "ample time" between the pretrial Rule 404(b) hearing and trial to challenge the veracity of the transcripts. In the recordings, the

victim and Defendant were whispering, making it difficult to hear. The victim repeatedly asked Defendant to let her out, and several times, Defendant threatened to harm her in response. Defendant can be heard verbally abusing the victim throughout the recordings; "[s]lapping sounds" and "tussling" are also audible. Defendant also threatened to stab the victim. The victim explained to Ms. Langford in the group text message that the night she made the recordings, Defendant made her sleep on the floor because she would not have sex with him.

The victim texted Ms. Langford, or her sister, about multiple instances of Defendant's abuse of the victim through the fall of 2019. On cross-examination, Ms. Langford stated that in September 2019, the victim sent her a photograph of a group of women, and the victim stated that one of the women was her "replacement."

MPD Officer Adam Bush responded to the hospital following the June 15 incident. The victim told Officer Bush that earlier that day she had gone to the hospital to have her injuries checked after Defendant threw a cell phone at her head. When she returned home from the hospital, a man wearing a red ski mask punched her, rendering her unconscious. The victim awoke in the back of her car with Defendant driving. Officer Bush observed that the victim had a bruise around her right eye, a laceration on her left wrist, and a puncture wound on her right side. Hospital security informed Officer Bush that Defendant had returned to the hospital, then left again. Officer Bush and his partner located Defendant down the road from the hospital and arrested him. On cross-examination, Officer Bush agreed that the victim had given several different statements at the hospital and later to his sergeant. On redirect examination, he explained that the victim was medicated when they arrived and had difficulty staying awake.

In the early morning hours of August 11, 2019,[4] Officer Leroy Williamson testified that he responded to the scene of a two-vehicle accident involving the victim and Mr. Nguyen, the August 10 incident, but quickly changed his location when he learned the victim was at the hospital. He glanced around the scene before he left and noticed a large stuffed bear in the backseat of one of the vehicles. When Officer Williamson arrived at the hospital, the victim told him that Defendant had called her that morning to discuss their relationship, and asked to retrieve gifts he had given her. Defendant had someone drop him off at the victim's house, picked up the gifts, and offered to pay the victim for a ride home. The victim agreed, but once they were in the car, Defendant began yelling at her. The victim stated that Defendant displayed a screwdriver and a knife and threatened to kill her if she stopped the vehicle. Defendant forced her to perform a sexual act on him, then

---

[4] While the transcript reflects that Officer Williamson responded to this accident on June 15, 2019, it is clear based on the entire record, that Officer Williamson responded to the August 10 Rule 404(b) car accident.

Defendant took over driving and intermittently assaulted the victim. Defendant made the victim call Mr. Nguyen to ask for gas money; after the victim received the electronic transfer of the money, she then transferred it to Defendant. Defendant stopped at a gas station and went inside, telling the victim to remain in the car and not to draw any attention to herself. The victim sent an S.O.S. message to Mr. Nguyen, who caught up with Defendant and the victim and pursued the car until Defendant crashed the victim's car into Mr. Nguyen's car. Officer Williamson did not ask to see the victim's injuries.

On cross-examination, Officer Williamson stated that he did not locate a knife or determine the exact location of the sexual assault because he was tasked with creating the report, not conducting the investigation. Officer Williamson was unaware if Defendant had been criminally charged from that incident because it was not his responsibility. After Officer Williamson was excused, the trial court cautioned defense counsel in its questions, noting that "whether or not there were charges made by the authorities is irrelevant" and implied that the officers did not believe that the offense happened.

MPD Officer Michael Boyd responded to the victim's house on the morning of the September 12 incident. He observed that the victim appeared to be scared to answer the door. The victim told him that Defendant was in her driveway as she left to attend court that morning. The night before, Defendant had gone to her workplace but she was not there, and Defendant texted her: "Wait till the mornin . . . Since you wanna play[,]" and "I swear you gone pay[,]" followed by "Hunt yo a\*\* down[.]" The victim filled out a "hold harmless" form, which included a handwritten statement from the victim, and a domestic violence lethality screening form.[5] On the form, the victim indicated that the situation was "getting worse" and circled "yes" to whether Defendant had used a weapon against her, threatened to kill her, and if she thought that Defendant might try to kill her. Based on her answers, the victim scored as a high risk and Officer Boyd connected her to an advocate with whom the victim spoke for five minutes. The victim declined transportation to a safe location.

On cross-examination, Officer Boyd stated that the victim had learned from a co-worker that Defendant had gone to her workplace the night before. Officer Boyd also acknowledged that the text messages the victim showed him came from different numbers and stated he did not investigate the numbers any further. On redirect examination, Officer Boyd explained that as a patrol officer he was not tasked with investigating domestic violence cases.

---

[5] The lethality screening form was a one page document with questions designed to assist MPD officers in determining a domestic violence victim's level of risk. If a victim scored as a high risk or if the officer determined it to be necessary, the officer connected the victim with an on-call domestic violence advocate.

Later that same day, between 7:00 and 8:00 p.m., MPD Officer Jonathan Hightower responded to a single vehicle crash where the victim's vehicle had struck a utility pole and was totaled. The victim told Officer Hightower that Defendant, who was driving a black vehicle, ran her off the road. The victim had non-critical injuries. Because the victim said the other vehicle did not make direct contact and there were no eye witnesses, Officer Hightower was instructed to cite the victim for striking a fixed object. Officer Hightower recalled that there was debris near the crash site, but he could not confirm whether it was from another vehicle.

On cross-examination, Officer Hightower acknowledged that in his report, the victim said that Defendant was driving was a Nissan Maxima. Officer Hightower's body camera footage was played for the jury to show that the victim said Defendant had disguised himself with a wig, not a red mask. Officer Hightower agreed that the victim gave different statements to him and to his partner.

Regarding the December 5 incident, around 2:00 p.m. on December 5, 2019, MPD Officer Billy Jackson responded to the parking lot across the street from the courthouse for a call involving the victim. The victim told him that Defendant called her from a restricted number and said: "Let the games begin." The victim found a "warning sign" on her car. The victim again filled out a hold harmless form and declined transportation to a safe location. On the lethality screening form, the victim indicated that the situation was "getting worse" and circled "yes" as to whether Defendant had used a weapon against her, threatened to kill her, and if she thought Defendant might try to kill her.

On cross-examination, Officer Jackson stated that he did not look at the victim's call log, he did not see the warning sticker left on the victim's car, and he did not ask if the victim recognized the caller's voice. On redirect-examination, Officer Jackson clarified that he did not ask if the victim recognized the voice because she had identified the caller as Defendant.

Later that same day, MPD Officer Anfernee Brown responded with his partner, Officer Michael Williams, to the victim's house regarding the December 5 incident. Officer Brown had previously responded to the address for "[d]omestic related calls." The victim appeared "frightened and panicked" and said that she did not want to die. The victim stated that Defendant had called her eight times from private numbers and threatened to kill her. The victim filled out a hold harmless form and declined transportation to a safe location. Officer Williams's body camera footage was played for the jury during Officer Brown's testimony. Officer Brown called for a direct patrol of the victim's street following this incident.

- 10 -

On cross-examination, Officer Brown agreed that he did not investigate whether the phone numbers from which the victim received calls that night were associated with Defendant. Officer Brown also agreed that the victim asked him if she could shoot Defendant. The victim had shown Officer Brown what she considered the "warning sticker" Defendant left on her car earlier that day.[6] Officer Brown testified that the "warning sticker" was a City of Memphis parking ticket, but he was not sure whether it had "been placed on her car by [Defendant] or by someone else. It could have been placed on someone else's [car]." Officer Brown agreed that he told the victim that her parking decal was expired. On redirect examination, Officer Brown stated that the victim had reported that the City of Memphis parking ticket could not have been issued for her car because she had parked in the Best Buy parking lot around 9:00 a.m., but left for a doctor's appointment before 11:00 a.m. Officer Brown explained that the victim's parking decal showed that she paid for parking in Best Buy parking lot, which is not a City of Memphis parking lot, at 9:24 a.m., and the City of Memphis parking ticket, the "warning sticker," was issued at 11:11 a.m.

MPD Officer Marcela Weaver responded to the victim's house regarding the December 6 incident. Officer Weaver described the victim as "anxious and nervous." The victim reported that Defendant had called her and threatened to kill her mother if she moved out of Memphis, and that he was next door to her house with a rifle. Officer Weaver and her partner inspected the duplex next door and confirmed that no one was inside. The victim accepted transport to a safe location. On cross-examination, Officer Weaver stated that she did not look at the victim's phone or investigate whether there were cameras nearby. Officer Weaver asked the victim if she recognized the voice of the person who called; the victim recognized the voice as Defendant's.

Sergeant Daniel Cordero spoke with the victim over the phone regarding the December 5 and 6 incidents. The victim reported that Defendant had called her approximately fifty times over the prior three days from blocked or restricted numbers. Sergeant Cordero noted that the MPD database showed six previous reports involving the victim and Defendant. Sergeant Cordero testified that domestic violence victims rarely accept transport if they have a safe place to stay. On cross-examination, Sergeant Cordero explained that he issued a warrant against Defendant for harassment based on what the victim told him and the photograph of the victim's call log; he did not request Defendant's phone records.

The victim's 911 call regarding the December 10 incident was played for the jury. The victim whispered and explained that Defendant was on the opposite side of the door

---

[6] It is unclear from the transcript why the victim thought the parking ticket was a "warning sticker" from Defendant. The "warning sticker" does not appear in the record.

and would be able to hear her if she spoke louder.  In response to the 911 call, MPD Officer James Henderson was dispatched to the victim's house and found Defendant sitting in a blue car in the victim's driveway.  Officer Henderson detained Defendant for  safety purposes, and later learned that Defendant had given a fake name.  After detaining Defendant, Officer Henderson knocked on the door and the victim came out crying.  The victim reported that Defendant had kidnapped her from her workplace at knifepoint and threatened to kill her if she did not go with him.  Defendant had taken the victim's keys and driven to the "Orange Mound area," where he physically assaulted the victim and had threatened to stab her and choke her with a cord.  The victim had sex with Defendant to keep him calm, and ultimately convinced him to take her home so she could use the restroom.  Officer Henderson found a cord from a weed trimmer in Defendant's pocket and a knife in the driver side door pocket of the car.  Officer Henderson's body camera footage was played for the jury.

On cross-examination, Officer Henderson confirmed that the victim reported that she had taken Defendant to the hospital the Friday before and had visited Defendant in the hospital on Sunday.  Officer Henderson also confirmed that the victim did not mention the sexual assault to his partner, and Officer Henderson did not notice that the victim had any injuries.  On redirect examination, Officer Henderson stated that the victim told him she took Defendant to the hospital because he had overdosed on pills.

MPD Lieutenant James Boyland investigated the December 10 Rule 404(b) incident.  In addition to what the victim had reported to Officer Henderson, she explained to Lieutenant Boyland what she and Defendant were each wearing during that incident.  Lieutenant Boyland issued a "be on the lookout" for the victim's car because Defendant had not returned it.  When Lieutenant Boyland interviewed Defendant, he admitted that he went to the victim's workplace, but he denied physically or sexually assaulting her.  After the interview, Defendant received an emergency committment for his protection because he had stated that "he didn't think he could live without [the victim]."  Lieutenant Boyland then obtained video surveillance footage from the victim's workplace, which was played for the jury.  The footage showed Defendant waiting in the parking lot of the victim's workplace, then speaking with the victim, then the two of them walking very close together across a bridge.  Defendant reached toward the victim, and Lieutenant Boyland suggested that Defendant grabbed the victim's car keys at that point.

On cross-examination, Lieutenant Boyland agreed that it was not obvious from the video footage whether Defendant was armed and there did not appear to be a struggle.  Following Officer Boyland's interview of Defendant, Defendant sent him some audio and video recordings.  The State objected to testimony regarding the content of the recordings, arguing that the trial court had previously excluded Defendant's recordings.  In response, Defendant argued that they sought to elicit Officer Boyland's knowledge of the events in

the recordings which was different than admitting Defendant's actual recordings. The trial court prohibited Defendant from questioning Officer Boyland about the content of the recordings, but allowed Defendant to inquire about Defendant's sending him the recordings and the date Defendant sent the recordings.

MPD Officer John Jackson testified that he responded to the victim's residence at 10:15 p.m. regarding the December 14 incident. When he arrived, the victim appeared "upset" and told him that Defendant had called her at least twenty times between 2:00 p.m. and 10:15 p.m. threatening to harm her and her parents, and she showed him her call log. The victim had an order of protection against Defendant at the time. The victim filled out a hold harmless form and declined transportation to a safe location. Officer Jackson testified that he had responded to the victim's house "at least six or seven times." On cross-examination, Officer Jackson agreed that he did not photograph the victim's call log or conduct any follow up investigation from the incident.

MPD Officer Victor Alvarez responded to the victim's residence on December 15, 2019, regarding the victim's complaint of harassing phone calls from Defendant, the December 15 incident. Officer Alvarez's body camera footage was played for the jury. Officer Alvarez recalled that the victim let out a "nervous laugh" and told him Defendant kept calling her and playing "creepy music" over the call, such as "1, 2, Freddie's coming for you." She played him a voicemail of the "creepy music." Officer Alvarez photographed the victim's call log. The victim completed a hold harmless form and declined transportation to a safe location. The victim completed a lethality screening form, with the same answers as past lethality screening forms, and spoke with an advocate for about ten minutes. On cross-examination, Officer Alvarez confirmed that the victim never spoke to a person in the harassing phone calls.

MPD Sergeant David Boggan spoke with the victim regarding threatening phone calls from Defendant, the December 16 incident. The victim reported that Defendant called her on a restricted number and used a computer generated voice to threaten her. The victim knew it was Defendant because of the content of the threats. Sergeant Boggan prepared a warrant against Defendant for aggravated stalking and violation of bond conditions. On cross-examination Sergeant Boggan agreed that he did not look at the victim's call log, listen to the computer generated voice messages, or subpoena the victim's phone records.

MPD Officer Valeshia Jennings responded to the victim's house regarding the December 19 incident. The victim told her that Defendant had kidnapped her from the courthouse around 9:00 a.m. She tried to run away from Defendant, but she fell. Defendant displayed a knife and threatened to kill her if she did not leave with him. Defendant drove the victim around Memphis for the remainder of the day. When the victim said she was hungry, Defendant made her drive because he did not want the drive through cameras to

record him in the driver seat. The victim committed traffic violations in an unsuccessful attempt to attract police attention. The victim dropped Defendant off at his mother's house, and she drove home and called police. Officer Jennings's body camera footage from his interaction with the victim was played for the jury.

MPD Sergeant James Harden investigated the December 19 incident. The victim provided a written statement that was substantially similar to the statement she gave to Officer Jennings. Based on the statement, Sergeant Harden prepared warrants against Defendant for aggravated assault, aggravated kidnapping, aggravated stalking, and violation of bond conditions. On Monday, December 23, 2019, the victim was dropped off at an MPD precinct. Surveillance footage from the precinct showed that the victim got out of the car wearing a long tan coat, and the driver left in the car. Once inside the precinct, the victim asked to speak with Sergeant Harden, and when he entered the lobby, she began crying and told him Defendant dropped her off at the precinct so she could drop the charges against him. The victim reported that she had gone to Nashville with Defendant because Defendant threatened to harm himself if she did not go with him, but Sergeant Harden did not learn any other details. After December 23, 2019, Sergeant Harden attempted to follow up with the victim regarding her vehicle. Although he never successfully contacted the victim, on December 27, 2019, Sergeant Harden issued a warrant against Defendant for theft of property. On cross-examination, Sergeant Harden confirmed that the victim did not tell him that Defendant kidnapped her.

On the evening of December 23, 2019, MPD Officer Daniel Adams and his partner, Officer Andres Juarez, responded to the victim's house regarding the December 20-23 incident. Before interviewing the victim, the officers tried unsuccessfully to locate the victim's car. Officer Juarez's body camera footage was played for the jury. In the footage, the victim was wearing the same long tan coat as when she entered the precinct, and the hood covered her head; she did not remove the hood throughout the interview. The victim said she had gone with Defendant to Nashville the Friday prior. The victim initially told Defendant that her parents were responsible for the charges against him, but later told him she was responsible. The victim felt that she was not free to leave because Defendant had taken her phone. The victim reported that Defendant sexually assaulted her near Jackson, but she could not describe precisely where it occurred. Officer Adams did not think that they were inside Shelby County when the sexual assault occurred. The victim reported that while in Shelby County, Defendant assaulted and strangled her to where she could not breathe. Officer Adams recalled that the victim had been coughing during the interview and had moved the hood of her coat to the side to show them bruising on the back of her neck. Officer Adams was instructed by an on-scene supervisor to prepare a memo, rather than a report, because "[the victim] never knew her exact whereabouts of the kidnapping and criminal assault, . . . even though she described being assaulted within the city limits."

During cross-examination, Officer Adams agreed that the victim told him that when they returned to Memphis, she had picked up a friend in the Westwood area while Defendant hid in the trunk with two knives. Officer Adams stated that the victim, without prompting, reported that Defendant sexually assaulted her. Defendant attempted to play an additional portion of Officer Juarez's body camera footage, which he argued would impeach Officer Adams' testimony by showing a discussion between the officers about whether they should ask the victim if Defendant sexually assaulted her. Following the State's objection, the trial court ruled that Defendant could play any statement by the victim and could ask Officer Adams if the officers decided after discussion to ask the victim whether Defendant sexually assaulted her, but that the footage of the conversation between the officers was inadmissible hearsay. Officer Adams testified that throughout the interview, he asked the victim if she had been sexually assaulted because she had mentioned it previously. On redirect examination, Officer Adams explained that the victim reported that Defendant threatened to kill her if she told her friend he was in the trunk of the car.

Jacqueline Watkins, the Shelby County general sessions court supervisor of records, testified that on June 17, 2019, the victim had filed for, and was granted her first temporary order of protection based on the facts of the June 15 incident; Defendant was served by phone on June 19, 2019. She stated that the proof of service reflected that Defendant had to be removed from the victim's house one hour after he was served with the order of protection. The order of protection was dismissed because the victim did not appear for her court date. On August 28, 2019, the victim was granted a second temporary order of protection based on the facts of the August 10 incident. Defendant was not served, and the order of protection was dismissed because the victim did not appear for her court date. The third and final temporary order of protection was issued on December 6, 2019, based on the facts of the December 5 and 6 incidents. Defendant was served on December 17, 2019. At the December 19, 2019 court date, the temporary order of protection was dismissed because the victim failed to appear. On cross-examination, Ms. Watkins affirmed that the victim's narrative for the June 19 order of protection did not mention that the assailant wore a red mask.

On January 2, 2020, Eric Williams was sitting in his vehicle when he saw a tall and slim black man wearing a burgundy hoodie pull up to the corner of Jackson Avenue and Maple street in a silver car. The man got out of the vehicle, lifted something out of the trunk and placed it on the sidewalk next to a trash can secured to the stop sign. The man smiled, then got back into the car and drove away. About five minutes later, Mr. Williams saw the same man wearing the same clothes walk back down the street from the direction the car had previously driven. The man flagged down a woman Mr. Williams knew to be Ms. Mattie Woodard, pointed toward the sidewalk, and walked away. Mr. Williams saw

- 15 -

an ambulance arrive, walked to the scene, and discovered that the man had place a body on the sidewalk.

On cross-examination, Mr. Williams acknowledged that in his statement to police he reported that he was not sure it was the same man that flagged down Ms. Woodard and that he did not report to police that the man smiled after he placed the victim on the sidewalk. On redirect examination, Mr. Williams affirmed that the car he saw looked silver, but acknowledged that it was a rainy day.

Mattie Woodard testified that she lived on Maple Street in Memphis. On January 2, 2020, a man with a "low haircut" wearing a "red or burgundy hoodie" and dark jeans flagged her down as she pulled out of her driveway. When she looked in the direction the man was pointing, she saw a body. The man was gone when she turned back around. Ms. Woodard called 911, and later gave a statement to the police. Ms. Woodard was shown a photographic lineup, but did not positively identify anyone. However, she wrote on the bottom of the lineup that she was "leaning toward #6 because of the hair and the long neck." Number six was a photograph of Defendant. On cross-examination, Ms. Woodard stated that the man said, "there's a body over there." She described the man's demeanor as "anxious . . . like he was kind of either upset or he had some other intentions."

Paramedic Joseph Gosser arrived on the corner of Jackson Avenue and Maple at 11:48 a.m. on January 2, 2020. He was the first on the scene, and saw a body lying on the sidewalk next to the stop sign. Paramedic Gosser did not find any signs of life and noted that rigor mortis had already set in, meaning that the victim had been dead for at least thirty minutes. The victim had on a coat and no shirt, and Paramedic Gosser saw stab wounds on her torso. He noticed blood on her jeans and defensive wounds on her hands and fingers. Paramedic Gosser noticed a stab wound on her right leg, so he cut the leg of the pants to see it better before he covered the victim's body.

Dr. Katrina Van Pelt, an expert in forensic pathology, performed the victim's autopsy and discovered thirty-eight injuries, including abrasions, stab wounds, and superficial incised wounds. She noted several defensive wounds to the victim's hands and arms, and performed a postmortem sexual assault kit. The victim had a two-inch-deep stab wound just above her right knee that "completely transected the femoral artery and vein" and a two-and-one-quarter-inch stab wound to the back of her left knee that transected the major branches of a large artery. Dr. Van Pelt opined that either of the injuries could have been fatal alone, but that the victim likely died more quickly because of the combined effect of the wounds.

Sergeant Parker Craig, the lead investigator in this case, learned about the history between the victim and Defendant from an officer on scene who was familiar with them.

Sergeant Craig obtained video footage of the corner of Jackson Avenue and Maple Street. The footage showed a blue car, later identified as the victim's car by its license plate number, pulling up to the stop sign, Defendant getting out of the driver's seat and picking up the victim's body from the trunk, and Defendant placing the victim's body on the sidewalk. Defendant then drove away in the car. About ten minutes later, Defendant returned on foot. When he walked around the corner, he acted startled by the body before he waived down Ms. Woodard and pointed at the victim's body. Defendant then left on foot. Sergeant Craig contacted the United States Marshal's Fugitive Task Force for their assistance in locating and detaining Defendant because Defendant had active warrants for his arrest. Defendant was detained at his mother's house around 4:00 p.m. on January 3, 2020.

Sergeant Craig did not notice any injuries on Defendant. Defendant told him that he had picked the victim up the evening of January 1, 2020, and they slept in the victim's car together. The next morning, Defendant picked up an unknown male and female, and he and the victim drove around with the unknown male and female for hours. Defendant went to the Tiger Mart convenience store at Jackson Avenue and Bellevue Boulevard, and the victim and the unknown female got out of the car and walked away. Sergeant Craig told Defendant that his story did not make sense, and Defendant immediately amended his story. Defendant then explained that he went inside the Tiger Mart to get food and left the victim in the car with the unknown male and female. When he returned, the victim had been stabbed multiple times, the unknown male and female were gone, and a gaming system that had been in the car was also gone. The victim had tied her shirt around her right leg, and Defendant removed her socks and tied them around the victim's left leg. Defendant reported that he then began to drive to a hospital until he realized the victim had died. He pulled over and held the victim in his arms while he cried, then went to an abandoned house for an undetermined amount of time and decided against hiding the victim's body. He drove to the intersection of Jackson Avenue and Maple Street to ensure that the victim's body would be found, removed her body from the front seat, and placed her body on the sidewalk. Defendant then drove away before he returned to the scene and flagged down a passing car. Defendant said he remained hidden from view until the ambulance arrived, then he went to West Memphis, Arkansas, and slept in the car overnight.

The next day, Defendant returned to Memphis and was detained at his mother's house. When Sergeant Craig told Defendant that there was video evidence of him lifting the victim's body from the trunk of the car, Defendant amended his story again. This time, Defendant stated that while at the abandoned house, he had moved the victim's body to the trunk of the car, tried to clean the car, and changed his clothes. Defendant stated that on his way to West Memphis, Arkansas, he had gotten rid of the red and black flannel shirt and black jeans he wore when the victim was killed. Defendant explained that he did not

- 17 -

call for police because he knew he had warrants for his arrest. Defendant never told Sergeant Craig that the victim had attacked him. Sergeant Craig explained that he had not charged Defendant with the victim's murder, but Defendant remained in custody on his other warrants after the interview. Sergeant Craig obtained video footage from the Tiger Mart for the hours Defendant claimed to have been there. Neither Defendant nor the victim's car were seen on the video footage. Defendant consented to a search of his phone.

Based on the location data from Defendant's phone, officers were able to obtain traffic camera footage from the area of Williams Avenue and Ford Place, which showed Defendant tossing his shirt and pants into a high grassy area along the road then drove down a dead-end road. From that area, officers located and collected Defendant's clothing, a knife and its cover, and a machete. The victim's car was also found behind an abandoned house nearby. MPD Lieutenant Michael Coburn processed the victim's car. He stated that the passenger seat of the car was visibly stained with blood, which was later determined to be the victim's. There was also what appeared to be a bloody handprint on the back passenger window, but it could not be determined if the handprint was the victim's. Lieutenant Coburn stated that Blue Star luminescent, which reacted to blood not visible to the naked eye, showed that a significant amount of blood had been on the center console between the front seats and some blood had been in the trunk and on the driver side door. Lieutenant Coburn found a receipt from a West Memphis, Arkansas Walmart showing the purchase of a kitchen knife on January 3, 2020. The SKU number on the receipt matched a knife that appeared to be the same as the one collected near Williams Avenue and Ford Place. Sergeant Craig interviewed Defendant again on January 9, 2020, and confronted him with the evidence contradicting Defendant's previous stories. Sergeant Craig stated that Defendant only seemed interested in determining what Sergeant Craig knew, what he would be charged with, and how much time he could get. Sergeant Craig informed Defendant he would be charged with first degree murder and tampering with evidence. The interview then ended because Defendant would no longer speak with him.

TBI Special Agent Jordan Ragon testified as an expert in forensic biology. Special Agent Ragon tested the knife, machete, and Defendant's clothing. There was no blood on the knife or the machete, but the victim's blood was on Defendant's shirt and jeans. The victim's DNA was also on the collar of Defendant's shirt as well as the zipper, button, and inside waistband of Defendant's jeans. Special Agent Ragon analyzed the victim's postmortem sexual assault kit. Defendant's DNA was found on the vaginal swabs and was consistent with the major contributor on the rectal swab, which had a mixture of "at least two individuals including at least one male." Special Agent Ragon agreed that the other individual could have been the victim. Before cross-examination, the trial court allowed a recess for defense counsel to consult with his expert. On cross-examination, Special Agent Ragon agreed that she could not determine, based on the presence of DNA alone, whether the sexual contact was consensual.

- 18 -

MPD Sergeant Dennis Evans, Jr., reviewed the location data from Defendant's cell phone. Around 11:00 a.m. on January 2, 2020, Defendant's cell phone traveled from an apartment complex in the Hickory Hill neighborhood to the area of Jackson Avenue and Maple Drive, where it remained for approximately thirty minutes, and then traveled back to the Hickory Hill neighborhood. Around 6:30 p.m., Defendant's phone traveled to West Memphis, Arkansas, where it remained until the next day. No location data from Defendant's cell phone was found at the Tiger Mart or near Baptist Hospital on Walnut Grove on January 2, 2020. On January 3, 2020, Defendant's cell phone traveled from West Memphis, Arkansas, to the area of Williams Avenue and Ford Place, before it returned to Defendant's mother's house where Defendant was detained.

Sergeant Evans also analyzed the search and web history on Defendant's phone. The Shelby County Sheriff's Office Warrant Information website was bookmarked on Defendant's internet browser. Around 8:00 p.m. on January 2, 2020, Defendant searched: "[H]ow do you know if someone was in a trunk" and "Can you die instantly from stabbing? Or is it always slow and painful?" Sergeant Evans explained that he ran a key word search for "stab" which returned eight results, with the first dated December 20, 2019. The key word search for "kill" returned sixteen results, with the first dated December 19, 2019. Sergeant Evans stated that many of the searches also involved self-harm. Additionally, on December 22, 2019, Defendant searched: "[W]ho can drop aggravated assault charges" and "Is it possible to drop aggravated assault charges[.]" Sergeant Evans found a photograph of an MPD incident report on Defendant's phone, and explained that he had determined Defendant had saved the photograph from the victim's iCloud account. On cross-examination, Sergeant Evans said that there were many messages between the victim and Defendant and that Defendant's call log indicated that the victim had called Defendant during December 2019.

The State rested its case, and the trial court denied Defendant's motion for judgment of acquittal.

Quinona Poole, Defendant's cousin, testified that Defendant came to live with her in Nashville in September 2019. In October 2019, the victim visited Nashville to surprise Defendant. After the visit, Defendant decided to move back to Memphis, so Ms. Poole bought him a bus ticket, and the victim was supposed to pick Defendant up from the bus station. During the time Defendant lived with her, Ms. Poole did not think Defendant had left Nashville and been gone for one or two days.

On cross-examination, Ms. Poole testified that Defendant lived with her for about six weeks. She explained that it is possible to drive from Nashville to Memphis and back in one day and that she would not have known if Defendant had done this because she was

not home often. Ms. Poole recalled that Defendant had a car when he first came to stay with her, but it was taken in early October for reasons unknown to her. During Ms. Poole's cross-examination, the State asked how often Ms. Poole had seen Defendant "before he was incarcerated?" Following that question, Defendant moved for a mistrial arguing that it was improper for the jury to hear about his incarceration. The trial court noted that the jury had previously heard about Defendant's incarceration, and denied a mistrial, but cautioned the State to "stay away from that," and instructed the jury to disregard the question.

Defendant testified that he killed the victim, but he did not plan or intend for her to die. Defendant admitted that he "put [his] hands on" the victim during the August 10 incident. In September 2019, Defendant did not have any connections to Memphis, so he borrowed a friend's car and moved to Nashville to stay with his cousin. Defendant denied damaging the car while it was in his possession. Defendant stated that he had no contact with the victim after he moved to Nashville, until she "popped up" at his workplace and stayed with him for the weekend. Defendant moved back to Memphis on October 15, 2019, to pursue a relationship with the victim. Defendant described the victim as "jealous" during their relationship and explained that they had access to each other's phones. On December 2, 2019, Defendant told the victim that he had cheated on her and ended the relationship. Defendant admitted that he had repeatedly called the victim on December 5, but explained that he only did that because the victim had called his mother regarding the August 10 incident. After he learned about the charges from the December 5 incident, Defendant became depressed and took sleeping pills; the victim took him to the hospital. Defendant denied the allegations from all other incidents.

On January 1, 2020, Defendant picked the victim up around the corner from her house, and they went to his aunt's house. While at his aunt's house, they watched television and were "intimate." The next morning, after they got into the victim's car, Defendant went back inside for his phone charger. While he was inside, the victim went through his phone and became upset when she saw evidence that he had been with another woman two days prior. The victim continued to look through his phone and every time she saw something she did not like, she hit him on the back of the head and called him a liar. When Defendant started to drive the victim home, the victim opened his Facebook account and made "a whole big scene." The victim threatened to kill him and the woman she had seen him with on his Facebook account. Defendant began to yell back, and the victim pulled out a knife, lifted her shirt up, "tapp[ed]" herself with the knife, and threatened to press more charges. The victim threw Defendant's phone and swung the knife at him. When he pulled over to get his phone, the victim swung the knife at him again, and he grabbed the knife. The victim began to kick him in the face, and he "lost control" and swung the knife at the victim. Defendant could not recall how many times he swung the knife, but noted

that he continued for a couple of seconds then he threw the knife and put his head on the steering wheel to calm down.

The victim screamed his name, and when he looked, he saw blood "gushing" out of her leg. Defendant removed the victim's shirt and instructed her to tie it around her leg while he removed her socks and tied them around her other leg. He testified that he then drove toward the hospital, but the victim died on the way. Defendant did not call for an ambulance because he knew the victim's injuries were urgent and because he was scared due to his outstanding warrants. Defendant removed the victim's shirt because it was covered in blood, put her coat back on her, and placed the victim's body on Maple Drive. He then drove away, but returned on foot to flag someone down. Defendant stayed nearby until the ambulance and police arrived; he then drove to West Memphis, Arkansas, later that night. Defendant admitted that he discarded the knife and the victim's phone. Defendant searched online how to kill himself and stated that he first looked up how to commit suicide on December 19. The next day, he went to Walmart and purchased a knife then went to a secluded area and thought about committing suicide. Defendant admitted that he was active on social media after the victim's death and had responded to posts as if he did not know what had happened to the victim. Defendant returned to Memphis, parked the victim's car behind an abandoned house, and returned to his mother's house where he expected police to detain him. Defendant admitted that he was "not completely" truthful when he first spoke to Sergeant Craig, but maintained that he had been truthful about trying to save the victim's life.

On cross-examination, Defendant maintained that the only time he hit the victim was during the August 10 incident. Defendant admitted that he had access to the victim's iCloud and Snapchat accounts, and he looked through the victim's Snapchat, but explained that the victim did the same with his social media accounts. When Defendant did not recall telling the victim that he hit her because she was not the one for him, the State played the audio recording from the February 15 incident in which he made that statement. Defendant acknowledged that he was removed from the victim's house one hour after he was served with the first order of protection, but denied being served with the December order of protection. He admitted that he had the victim's car from December 23, 2019, through January 3, 2020. Defendant reaffirmed that he and the victim were engaged in a violent struggle that led to her death and that he was "not thinking[,] just reacting" when he killed the victim.

Based on this evidence, the jury convicted Defendant as charged for the first degree premeditated murder of the victim and tampering with evidence by concealing the victim's vehicle. The trial court imposed a life sentence for count one. Following a sentencing hearing, the trial court imposed a consecutive six-year-sentence for count two. Defendant

- 21 -

filed a timely motion for new trial, which was denied on January 12, 2023. This timely appeal followed.

**Analysis**

I.  Sufficiency of the Evidence

Defendant asserts that there was inadequate evidence to support a finding of premeditation and intent because the only evidence regarding his state of mind at the time of the killing was his own testimony, in which he denied that he intended or planned to cause the victim's death. The State argues that the Rule 404(b) incidents and the circumstances surrounding the killing provided sufficient evidence upon which a reasonable jury could find that Defendant acted with intent and premeditation. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quotations omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quotations omitted) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quotations omitted) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court

"neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

First degree murder is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation requires that an act is done:

> after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). The existence of premeditation is "a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003). The jury "cannot speculate what was in the killer's mind," *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007), but it may consider the following non-exclusive list of factors to infer premeditation:

> (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation on the victim's part; and (8) a defendant's failure to render aid to a victim.

*State v. McKinney*, 669 S.W.3d 753, 773 (Tenn. 2023) (citing *State v. Clayton*, 535 S.W.3d 820, 845 (Tenn. 2017). As there is often no direct evidence of a defendant's state of mind, "premeditation may be proved by circumstantial evidence[.]" *Davidson*, 121 S.W.3d at 614-15.

When viewed in the light most favorable to the State, the evidence presented at trial showed that Defendant and the victim began their relationship in the fall of 2018. By February 2019, Defendant had begun to abuse the victim, and between June and December 2019, the abuse escalated. During that time, the victim was granted three temporary orders of protection, two of which were dismissed because Defendant kidnapped and threatened the victim to prevent her from appearing in court for the hearings. Additionally, during the

same time frame, Defendant was responsible for three different vehicles driven by the victim being wrecked and totaled. Defendant repeatedly made harassing phone calls, threatened to harm the victim's family, and threatened to post explicit photographs and videos of the victim without her permission. Defendant kidnapped the victim twice, and released her after the December 20-23 Rule 404(b) incident so she could drop the charges against him regarding the December 19 Rule 404(b) incident. In December alone, the victim contacted MPD at least ten times regarding Defendant's threatening and abusive behavior, and many of those incidents occurred while an order of protection was in effect. The victim told multiple people that Defendant had threatened to kill her. Mr. Nguyen himself heard Defendant threaten to kill the victim. Each time the victim filled out MPD's domestic violence lethality screening form, she affirmed that Defendant had threatened to kill her and had used a weapon against her. Defendant conducted his first internet search regarding death by stabbing on December 19, 2019.

Although Defendant testified that he did not intend or plan to cause the death of the victim, the jury was free to disregard his testimony in favor of other evidence to the contrary. Further, the jury was instructed that both flight and concealment of evidence could justify an inference of guilt. Additionally, the jury was instructed on lesser-included offenses, including voluntary manslaughter, which defense counsel argued was the proper conviction. However, in returning a verdict of guilt for first degree murder, the jury chose to credit the State's theory. *See Bland*, 958 S.W.2d at 659. The evidence presented at trial was sufficient for a reasonable jury to find beyond a reasonable doubt that Defendant intentionally and with premeditation killed the victim. Defendant is not entitled to relief on this issue.

## II. Admission of Defendant's Prior Bad Acts under Rule 404(b)

Defendant contends that evidence of the Rule 404(b) incidents should have been excluded because it was improper propensity evidence and irrelevant to his state of mind on the date of the killing. The State argues that the trial court properly found each incident admissible for a purpose other than propensity. We agree with the State.

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" Tenn. R. Evid. 404(a). However, such evidence is admissible if "it is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice." *State v. McBee*, No. E2021-01048-CCA-R3-CD, 2022 WL 16833562, at *19 (Tenn. Crim. App. Nov. 9, 2022) (citing *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985)), *perm. app. denied* (Tenn. Mar. 9, 2023); *see also* Tenn. R. Evid. 404(b) Advisory Comments. Before a trial court may admit evidence under Rule 404(b):

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The clear and convincing standard cannot be met solely from hearsay evidence unless it is admissible under an exception to the hearsay rule, such as Rule 804(b)(6). *State v. Sexton*, 368 S.W.3d 371, 405 (Tenn. 2012), *as corrected* (Oct. 10, 2012). Evidence is unfairly prejudicial if it has "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997).

When, as in this case, a trial court substantially complies with the procedural directives of Rule 404(b), this court reviews a trial court's decision to admit evidence of prior bad acts under an abuse of discretion standard. *Id.* at 652. The Tennessee Supreme Court has held that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. Aug 13, 2008) (quoting *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993)); *see also State v. Minor*, No. W2010-01677-CCA-R3-CD, 2012 WL 3055776, at *7-10 (Tenn. Crim. App. July 26, 2012).

Here, the trial court entered an extensive written order granting the State's Rule 404(b) motion recounting the testimony establishing the factual basis for each incident individually[7] before finding clear and convincing evidence that each event had occurred. The trial court then noted that each Rule 404(b) incident was relevant to Defendant's "motive, intent, and a settled purpose to harm the victim." Finally, the trial court found

---

[7] The trial court addressed the Rule 404(b) incidents by date, even if more than one Rule 404(b) incident occurred on that date. However, the trial court's order clearly outlined its separate consideration of the factual basis underlying each incident.

that the evidence had high probative value that was not outweighed by the danger of unfair prejudice.

We conclude that the trial court did not abuse its discretion in admitting the Rule 404(b) incidents. At the pretrial hearing, the State offered the testimony of twenty-six witnesses who had either personally observed, or who had been told by the victim about Defendant's specific abuse, including prior threats to kill the victim. We note that Defendant did not object at trial to any of the testimony regarding the Rule 404(b) incidents. Defendant's prior abuse of the victim, particularly the Rule 404(b) incidents that included threats with a knife, was relevant to show his settled purpose to harm the victim. Further, the Rule 404(b) incidents established a timeline of escalating abuse, ultimately culminating in the victim's death. Without evidence of these events, the jury would have been left without knowledge to "realistically evaluate the evidence." *State v. Gilliland*, 22 S.W.3d 255, 272 (Tenn. 2000) (noting that the jury may need knowledge of the circumstances surrounding the offense because "[e]vents do not occur in a vacuum"). While undoubtedly prejudicial, we cannot conclude that testimony regarding the incidents was *unfairly* prejudicial. Defendant is not entitled to relief.

### III. Admission of the Victim's Statements under Rule 804(b)(6)

Defendant asserts that the trial court erred in admitting the victim's statements under Rule 804(b)(6) because there were no legal proceedings pending against him when he killed the victim. The State argues that the trial court properly admitted the victim's statements under Rule 804(b)(6). We agree with the State.

Hearsay is an out of court statement offered in court for the truth of the matter asserted. Tenn. R. Evid. 801(b). Hearsay is inherently unreliable and inadmissible unless it fits into one of the exceptions. Tenn. R. Evid. 802; *Sexton*, 368 S.W.3d at 404. One such exception is forfeiture by wrongdoing, which makes admissible a "statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). The following principles guide application of Rule 804(b)(6):

> (1) the rule does not limit the subject matter of the statements; (2) the rule is not limited to statements made when a formal charge or judicial proceeding is pending against the defendant; (3) the trial court must conduct a jury-out hearing to determine whether statements are admissible; (4) the trial court must find that a preponderance of the evidence establishes "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and (5) the trial court must find that a preponderance of the

evidence establishes "that a defendant's actions were intended, at least in part, to procure the absence of the declarant."

*Minor*, 2012 WL 3055776, at *10 (citing *State v. Ivy*, 188 S.W.3d 132, 147 (Tenn. 2006). Further, Rule 804(b)(6) extinguishes confrontation clause concerns and extends from a trial on the underlying bad acts to a trial for murdering the victim. *Ivy*, 188 S.W.3d at 147-48. In addition to pending criminal prosecutions, "[e]arlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help" are relevant to whether a defendant killed a victim with the intent to procure the victim's unavailability as a witness. *State v. Milan*, No. W2006-02606-CCA-MR3-CD, 2008 WL 4378172, at *14 (Tenn. Crim. App. Sept. 26, 2008) (quoting *Giles v. California*, 554 U.S. 353, 377 (2008)). Rule 804(b)(6) requires only that a defendant be motivated *in part* by his desire to procure the unavailability of a witness. *See* Tenn. R. Evid. 804(b)(6); *State v. Brooks*, 249 S.W.3d 323 (Tenn. 2008). We are bound by a trial court's factual and credibility determinations underlying its evidentiary decisions unless the evidence preponderates against them, but we review "de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay." *State v. Mobley*, No. E2020-00234-CCA-R3-CD, 2021 WL 3610905, at *26 (Tenn. Crim. App. Aug. 16, 2021) (citing *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015)), *perm. app. denied* (Tenn. Sept. 11, 2023).

Defendant relies on *Brooks* to argue that the State had to prove that a motive for the murder was to make the victim unavailable as a witness and that Defendant's murder charge was not pending when he killed the victim. We find Defendant's reliance on *Brooks* misplaced. In *Brooks*, the defendant was indicted for the first degree murder of his girlfriend. At trial, the multiple witnesses testified regarding the defendant's prior abuse of the victim. *Id.* at 326. In determining that the victim's statements regarding the prior abuse were admissible under Rule 804(b)(6), the trial court "stated its view that the forfeiture by wrongdoing exception does not require evidence that the defendant intended to prevent the witness from testifying." *Id.* at 327. This court held that the trial court erred in admitting the statements because there was no evidence that the defendant killed the victim for the purpose of making her unavailable, but that the error did not violate the defendant's constitutional rights. *Id.* at 327-28. The Tennessee Supreme Court reversed this court's decision because there was no evidence that the defendant intended, in whole or in part, to make the victim unavailable to testify against him. *Id.* at 329. The supreme court noted that "there is no evidence that the defendant became aware that the victim had spoken with the police." *Id.*

We note that unlike in this case, the trial court in *Brooks* applied an incorrect legal standard by failing to determine whether the defendant was motivated, at least in part, by a desire to prevent the victim from testifying. *See id.* at 327. Further, it was clear that

Defendant was aware that the victim had repeatedly reported his abuse to the police. While it is unclear from the record whether Defendant had pending criminal cases at the actual time of the victim's death, it is clear that there were pending warrants of which Defendant was aware. *See Ivy*, 188 S.W.3d at 147 (noting that Rule 804(b)(6) does not require formal charges). Further, there was clear evidence presented at the pretrial hearing that Defendant had been served with two of the three orders of protection sought by the victim and that he kidnapped and threatened the victim to prevent her from attending the hearings, resulting in the dismissal of two of the orders of protection. Defendant had also been arrested for the June 15 Rule 404(b) incident and the December 10 Rule 404(b) incident, and he was served with a warrant for harassment from the December 6 Rule 404(b) incident. More significantly, after the December 20-23 Rule 404(b) incident, Defendant dropped the victim off at an MPD precinct with instructions to drop the charges against him.[8]

We conclude that the trial court correctly determined that the victim's statements regarding the Rule 404(b) incidents were admissible under Rule 804(b)(6). Defendant is not entitled to relief.

### IV.    Denial of Defendant's July 6, 2022 Motion for Continuance

Defendant argues that the trial court erred in denying his July 6 motion to continue the trial because a continuance would have allowed his expert to review the DNA reports and potentially discover evidence to support his theory that the victim's death occurred during a passionate fight. The State argues that the trial court acted within its discretion in denying the motion for continuance. We agree with the State.

We review a trial court's decision regarding a motion for continuance under an abuse of discretion standard. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). For this court to reverse a denial of a continuance, a defendant must show that the trial court abused its discretion and the defendant was prejudiced such that he was denied a fair trial or the results of the trial would have been different if the continuance was granted. *State v. Hurn*, No. W2022-01192-CCA-R3-CD, 2023 WL 7001621, at *5 (Tenn. Crim. App. Oct. 24, 2023) (quoting *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)), *perm. app. denied* (Tenn. Apr. 11, 2024); *see State v. Quinn*, No. E2022-01661-CCA-R3-CD, 2024 WL 1097642, at *20 (Tenn. Crim. App. Mar. 13, 2024), *no perm. app. filed*. A trial court must balance the potential harm to the nonmoving party caused by a delay against the potential harm to the moving party caused by no delay "within the context of the court's duty to administer the criminal justice system within its circuit, including the control of its docket."

---

[8] Although it could not have been considered by the trial court at the pretrial hearing, we note that Defendant's testimony at trial made it clear he was aware that he had arrest warrants based on allegations made by the victim at the time of the killing.

- 28 -

*Wyatt v. State*, No. M2019-00250-CCA-R3-PC, 2020 WL 1674014, at \*7 (Tenn. Crim. App. Apr. 6, 2020).

Defendant has not shown that he was denied a fair trial or that the result of the trial would have been different if the trial court had granted a continuance. While Defendant's oral motion for continuance and his appellate brief reference two DNA reports, only one report, from the postmortem sexual assault kit, was introduced at trial. Defendant asserts that a continuance would have allowed his expert to review that report to potentially determine that another man's DNA was present, thereby supporting his testimony that the victim's death was committed in the heat of passion rather than being a premeditated act. In denying Defendant's oral motion to continue made twenty days prior to trial, the trial court rejected Defendant's reasoning because the report on the DNA was inconclusive, a fact that could be used to cross-examine the State's expert and argued at trial. Indeed, at trial, Special Agent Ragon testified that Defendant's DNA was found on the victim's vaginal swabs and that Defendant's DNA was consistent with the major contributor on the rectal swab, which had a mixture of "at least two individuals including at least one male." Special Agent Ragon agreed that the other individual could have been the victim.

On cross-examination, Defendant could have, but did not question Special Agent Ragon about whether the other individual in the mixture could have been another man. Defendant did get Special Agent Ragon to agree she could not determine, based on the presence of DNA, whether the sexual contact was consensual. Finally, even if the DNA evidence had shown that the victim had sexual contact with another man, such evidence would have had no bearing on Defendant's claim that his cheating on the victim caused the fight that led to the victim's death. Defendant has failed to show that he was prejudiced by the trial court's denial of his motion to continue the trial date. Defendant is not entitled to relief.

V.     Exclusion of Defendant's Recordings

On appeal, Defendant asserts that the trial court erred by excluding audio recordings and photographs of his sexual relationship with the victim because the recordings were relevant to his intent and added context. The State argues that the excluded recordings were not relevant to any issue at trial. We agree with the State.

We review a trial court's decision about the admissibility of evidence under an abuse of discretion standard. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). A trial court abuses its discretion when it "applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (quoting *State v. Lewis*, 235 S.W.3d 136, 141

(Tenn. 2007)). Relevant evidence is evidence which tends to make any fact of consequence more or less likely than it would be without the evidence. Tenn. R. Evid. 401.

Whether Defendant and the victim had consensual sex was not relevant to whether Defendant intended to kill the victim. As the trial court noted in the pretrial hearing on the admission of the recordings and photographs, recordings depicting Defendant's sexual encounters with the victim did not "seem relevant in light of the fact that [the State is] not alleging [Defendant] raped [the victim]." Further, although the trial court did not allow the recordings and photographs to be entered into evidence, Defendant testified regarding their existence. Specifically, he explained that he and the victim had consensual sex on December 20, shortly after she reported the December 19 Rule 404(b) incident to police. He also testified that throughout December 2019, he and the victim were in contact "almost every day." Defendant's testimony established the context of his relationship with the victim; the recordings and videos, which were explicit, were not relevant.

We do not find it necessary to address Defendant's hearsay arguments regarding the videos because we conclude that Defendant's recordings were irrelevant to any issue at trial. *See Gilley*, 297 S.W.3d 739, 761 (noting that the trial court is not obliged to admit hearsay statements that fit an exception because other rules of evidence might justify exclusion). Defendant is not entitled to relief.

## VI. Exclusion of Certain Body Camera Footage

Defendant asserts that the trial court erred when it prohibited defense counsel from playing a portion of Officer Juarez's body camera footage showing Officer Adams interviewing the victim and that the omitted footage would have shown that contrary to her later statements, the victim made no mention of having been raped by Defendant. On appeal, Defendant argues that the footage would have impeached the credibility of the victim and its exclusion violated the rule of completeness. *See* Tenn. R. Evid. 106. Defendant further asserts that the footage was not barred by the hearsay rule because the victim's statements would not have been offered for the truth of the matter asserted. The State responds that this argument is waived because Defendant failed to include the excluded footage in the record. We note that the omitted footage is not included in the record, but we can determine from the record the contents of the omitted footage. However, we conclude that Defendant has waived this issue because he presents a new argument for the first time on appeal.

A party "cannot raise an issue for the first time on appeal nor can they change their arguments on appeal." *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023); *see State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. Apr. 19, 1988). This includes asserting a different theory of admissibility on appeal than was argued in the trial

court.  *See State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) (holding defendant's argument for admissibility under a hearsay exception waived because defendant only argued that it was not hearsay in the trial court).  Further, when "a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in this Court, the party waives the issue."  *State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) (footnote omitted); *see State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020).

At trial, Defendant argued that the additional footage would have impeached Officer Adams.  At the motion for new trial, Defendant "clarified" that he had argued at trial that the footage should have been admitted under the rule of completeness.  Now, on appeal, Defendant asserts that this footage should have been admitted to impeach the victim as the declarant because "[c]ertainly, a person who had just been raped, and was telling the truth, would have mentioned that right away."

The trial transcript does not reflect that Defendant argued for admission under the rule of completeness, and, in fact, Defendant twice explained that this footage was being offered "just to impeach" Officer Adams.  Because a party may not assert completely different grounds in the motion for new trial, Defendant has waived this argument.  *See Adkisson*, 899 S.W.2d at 635; *State v. Bowen*, No. M2022-01289-CCA-R3-CD, 2023 WL 6845805, at *9 (Tenn. Crim. App. Oct. 17, 2023) (noting that a party is bound by the evidentiary theory argued at trial), *perm. app. denied* (Tenn. Feb. 12, 2024).  Further, Defendant's argument that the footage should have been admitted to impeach the victim was not raised at trial, in the motion for new trial, or argued at the hearing on the motion for new trial.  Defendant has waived both arguments for this issue.  Defendant is not entitled to relief.

## VII.    Denial of Defendant's Motion for Mistrial

Defendant asserts that the trial court erred when it refused to grant a mistrial after the State asked Ms. Poole how often she saw Defendant before he was incarcerated.  Defendant argues that because the State's question violated Rule 404(b), the trial court erred in denying a mistrial.  The State argues that the specific objectionable question referred to Defendant's arrest in the current case and did not violate of Rule 404(b).  The State further points out that other witnesses had already referenced Defendant's prior incarcerations without objection and thus no mistrial was necessary.  We agree with the State.

This court will not interfere with a trial court's exercise of its discretion regarding whether to grant a motion for mistrial "absent a clear abuse of discretion on the record."  *State v. Hansard*, No. E2021-01380-CCA-R3-CD, 2022 WL 17574357, at *4 (Tenn. Crim.

App. Dec. 12, 2022) (quoting *State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015)), *perm. app. denied* (Tenn. Apr. 17, 2023). A mistrial is appropriate only when there is a manifest necessity, meaning "a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000); *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The party requesting a mistrial carries the burden of establishing its necessity. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). As stated above, propensity evidence is inadmissible unless it is offered for another purpose, such as intent, motive, and premeditation, and the trial court follows the procedural directives of Rule 404(b). *McBee*, 2022 WL 16833562, at *19.

Defendant relies upon *State v. Dotson*, in support of his contention that the question referencing his incarceration violated Rule 404(b). No. W2011-00815-CCA-R3-DD, 2013 WL 4728679 (Tenn. Crim. App. June 25, 2013), *aff'd*, 450 S.W.3d 1 (Tenn. 2014). In *Dotson*, the trial court ruled that the defendant's prior incarceration was admissible only for certain permissible purposes under Rule 404(b). *Id.* at *59. At trial, the State elicited testimony about the defendant's prior incarceration that did not fit within the permissible purposes. *Id.* at *61. The defendant objected, and the "trial court found that the testimony was not inappropriate and noted that multiple witnesses already had testified to the defendant's prior incarceration." *Id.* at *59. However, the trial court instructed the jury to consider the defendant's prior incarceration only to provide context. *Id.* at *60. This court determined that the testimony was improper but that any error was harmless because other witnesses had properly testified regarding the defendant's prior incarceration. *Id.* at *61.

In this case, similar to *Dotson*, other evidence regarding Defendant's incarceration for both the current offenses and the Rule 404(b) incidents was presented to the jury without objection. Officer Bush and Defendant both testified that Defendant had been arrested for the June 15 incident. Defendant himself testified that he was arrested for the December 5 incident. Finally, Lieutenant Craig testified that Defendant had been detained by the U.S. Marshals Fugitive Task Force because of his outstanding arrest warrants and that Defendant remained in custody on those warrants after their first interview on January 3, 2020.

We cannot conclude that a passing reference to Defendant's incarceration was unfairly prejudicial when it had previously been presented to the jury without objection. Even if the question was improper under Rule 404(b), the trial court instructed the jury to disregard the question, and the jury is presumed to follow the court's instructions. *See Banks*, 271 S.W.3d at 137. The trial court did not abuse its discretion in denying Defendant's motion for a mistrial. Defendant is not entitled to relief.

VIII.    Exclusion of the Victim's Family's Civil Law Suit

Defendant asserts that the trial court erred by excluding reference to the victim's family's lawsuit against the City of Memphis and the MPD to show the bias of MPD officers. The State argues that the trial court properly excluded this evidence because it was irrelevant to any issue at trial. We agree with the State.

"The propriety, scope, manner, and control of cross-examination of witnesses rests within the sound discretion of the trial court." *State v. Nevens*, No. M2000-00815-CCA-R3-CD, 2001 WL 430602, at *7 (Tenn. Crim. App. Apr. 27, 2001). A party may cross-examine a witness regarding any relevant matter. Tenn. R. Evid. 611(b). Further, a party "may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. "[G]reat latitude" should be allowed on cross-examination, especially regarding a witness's bias. *State v. Horne*, 652 S.W.2d 916, 918 (Tenn. Crim. App. 1983). "One method of establishing bias or prejudice is to establish that a witness is involved in a pending lawsuit based upon the same facts in controversy." *State v. Smith*, 1993 WL 119806, at *12 (Tenn. Crim. App. Apr. 15, 1993).

There are several cases from this court holding that the trial court abused its discretion by prohibiting the defendant to cross-examine a witness about a pending lawsuit predicated on the same facts. *See State v. Horne*, 652 S.W.2d 916, 919 (Tenn. Crim. App. 1983) (holding that it was harmless error to exclude reference to the victim's lawsuit against the defendant for the same injuries at issue in the criminal case); *Smith*, 1993 WL 119806, at *13 (Tenn. Crim. App. Apr. 15, 1993) (holding that the trial court abused its discretion when it prevented the defendant from asking the victim whether she had filed a lawsuit predicated on the same facts as the criminal case); *State v. Howell*, No. M2016-01812-CCA-R3-CD, 2018 WL 385505, at *11 (Tenn. Crim. App. Jan. 11, 2018) (concluding that exclusion of the defendant's civil rights lawsuit against arresting officers was reversible error because it was a "classic he-said-she-said case"); *State v. Tubbs*, No. 02C-01-9310-CR-00231, 1994 WL 697936, at *1 (Tenn. Crim. App. Dec. 14, 1994) (holding that it was harmless error to prohibit cross-examination of victim about his civil suit against the defendant); *see also State v. Russell*, 735 S.W.2d 840, 843 (Tenn. Crim. App. 1987) (concluding that it was not error to allow the State to question the defendant's husband about a lawsuit that he and the defendant had filed against the arresting officer); *Nevens*, 2001 WL 430602, at *8 (holding that the trial court did not err in allowing cross-examination of defendant regarding his contemplation of filing suit against third party).

However, in the above cases, the civil lawsuit and the criminal indictments were predicated on the same conduct by the defendant. Here, the civil lawsuit pertained to the conduct of the MPD during the December 19 incident, not Defendant's killing of the

victim. Because the victim's family's lawsuit was not predicated on the actions of Defendant that were the subject of the criminal charges at trial, we cannot conclude that the trial court applied an incorrect legal standard or made an illogical or unreasonable ruling. *See Russell*, 735 S.W.2d at 842 (noting that a trial judge may allow evidence "of a pending civil lawsuit when it arises out of the same circumstances as the matter before him").

Even if we could conclude that the trial court erred, the error would be harmless because of the overwhelming amount of evidence against Defendant. *See Horne*, 652 S.W.2d at 919; *Howell*, 2018 WL 385505, at *11. Unlike in *Howell*, this is not a "classic he-said-she-said case" that rested on the officers' credibility. Had the trial court allowed the civil lawsuit to have been used to impeach the MPD officers' testimonies, their testimonies were otherwise supported by body camera footage and police reports. Both the body camera footage and the police reports came into existence before the family's civil suit; Defendant does not contend that the footage and reports were in any way changed after the civil suit was filed. Therefore, it is unlikely that evidence of the pending civil lawsuit would have changed the outcome of the proceedings. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Defendant is not entitled to relief.

## IX.    Jury's Use of Transcripts of Audio Recordings

Defendant argues that the trial court abused its discretion by allowing the jury to use transcripts of audio recordings between Defendant and the victim because the jury should have been tasked with interpreting the recordings "without any influence from the prosecution." The State argues that Defendant has waived this argument for failing to include and reference the recordings and the transcripts in the appellate record. We agree that Defendant has waived this argument, but for different reasons.

We note that the record contains both the recordings and the transcripts, and Defendant appropriately references such in his brief. However, Defendant has failed to cite appropriate authority in support of his argument. His brief contains one paragraph of argument on this issue citing no legal authority. "Failure to cite authority to support argument will result in waiver of the issue." *State v. Watson*, 227 S.W.3d 622, 648 (Tenn. Crim. App. 2006) (citing Tenn. Ct. Crim. App. R. 10(b) and *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn.Crim.App.1997)); *see* Tenn. R. App. P. 27(a)(7)(A). Defendant is not entitled to relief.

### X.    Questioning Officer Boyland Regarding Defendant's Recordings

Defendant asserts that he should have been allowed to elicit testimony from Officer Boyland about his knowledge of the content of Defendant's recordings.  The State argues that Defendant has waived this argument by failing to cite authority in support of his position, or alternatively, that the trial court properly prohibited this line of questioning because the trial court had already determined the recordings were irrelevant.  We agree with the State that Defendant has waived this issue by failing to cite legal authority in support of his argument.

Defendant's brief regarding this issue cites three cases to provide the applicable standard of review but does not provide any legal authority to support his argument.  Defendant has waived this issue.  *See Watson*, 227 S.W.3d at 648; Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7)(A).  Defendant is not entitled to relief.

### XI.    Questioning MPD Officers Regarding Defendant's Charges from the Rule 404(b) Incidents

Defendant asserts that he was denied due process of law because the trial court *sua sponte* limited his scope of cross-examination by prohibiting defense counsel from asking MPD's officers whether Defendant had been charged for the Rule 404(b) incidents.  The State argues that Defendant waived this issue due to an inadequate brief, or alternatively, that the trial court did not abuse its discretion.  We agree with the State.

We conclude that Defendant has waived this issue for failing to provide citation to appropriate legal authority to support his position.  Similar to Defendant's tenth issue, Defendant cites to one case to provide the applicable standard of review, but he does not cite to any legal authority to support his argument.  *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7)(A).  Defendant is not entitled to relief.

### XII.    Cumulative Error

Defendant contends that he is entitled to relief under the cumulative error doctrine.  The cumulative error doctrine recognizes that there may be many errors that are harmless in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010).  To warrant relief under the cumulative error doctrine, there must have been more than one actual error committed during the trial proceedings.  *Id.* at 77.  Here, Defendant has failed to establish any error.  Defendant is not entitled to relief.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

JILL BARTEE AYERS, JUDGE